1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - - - X
 3
      UNITED STATES OF AMERICA,    :   10-CR-600 (DLI)
 4
                                       U.S. Courthouse
 5                                 :   Brooklyn, New York
         -against-
 6                                     TRANSCRIPT OF
                                   :   VIOLATION OF PROBATION
 7
                                   :
 8    ANDREW TEPFER,                   March 26, 2019
                                   :   3:00 p.m.
 9          Defendant.
10  - - - - - - - - - - - - - X
      UNITED STATES OF AMERICA,    :   18-CR-524(DLI)
11
12       -against-                 :

13
    ANDREW TEPFER                  :   TRANSCRIPT OF
14  and MARK WEISSMAN,                 STATUS CONFERENCE
                                   :
15          Defendants.
                                   :
16  X--------------------------
17
18  BEFORE:      HONORABLE DORA L. IRIZARRY, Chief Judge
19
    APPEARANCES:
20
    For the Government:     RICHARD DONOGHUE, ESQ.
21                          United States Attorney
                            271 Cadman Plaza East
22                          Brooklyn, New York 11201
                            BY:  NATHAN REILLY, ESQ.
23                               Assistant U.S. Attorney
24
25
```

2

1   For the Defendant
    Tepfer:                    DAWN M. CARDI, ESQ.
2

3   Weissman:                  HENRY MAZUREK, ESQ.

4

5   Court Reporter:      Holly Driscoll, CSR, FCRR
                         Chief Court Reporter
6                        225 Cadman Plaza East
                         Brooklyn, New York 11201
7                        (718) 613-2274

8
    Proceedings recorded by mechanical stenography, transcript
9   produced by Computer-Assisted Transcript.

10

11

12                          *      *      *

13

14          THE COURTROOM DEPUTY:  Criminal cause for status

15  conference on violation of probation under docket 10-CR-600,

16  United States versus Andrew Tepfer, and criminal cause for

17  status conference, docket number 18-CR-524, United States

18  versus Andrew Tepfer and Mark Weissman.

19          Please state your appearances.

20          MR. REILLY:  Good afternoon, Your Honor, Nathan

21  Reilly for the United States.

22          THE COURT:  Good afternoon.

23          THE COURTROOM DEPUTY:  For Probation.

24          PROBATION OFFICER:  Yes, good afternoon, Your Honor,

25  Allison Aucoin.

1          THE COURT:  Good afternoon.

2          THE COURTROOM DEPUTY:  For Pretrial.

3          PRETRIAL SERVICES OFFICER:  Good afternoon, Your

4    Honor, Shavoy Atkinson, Pretrial Services.

5          THE COURT:  Good afternoon.

6          Please have a seat.

7          MS. CARDI:  Good afternoon, Your Honor, Dawn Cardi

8    for Mr. Andrew Tepfer.

9          THE COURT:  Good afternoon.

10          MR. MAZUREK:  And good afternoon, Your Honor, Henry

11    Mazurek on behalf of Mark Weissman who is seated to my right.

12          THE COURT:  Good afternoon to both of you as well.

13    Again, I'm going to ask everyone to remain seated and speak

14    into the microphone so we can hear each other.

15          So, first, why don't we have a status report on the

16    new case, on 18-CR-524, and then we can address some status

17    reports that I have received in connection with Mr. Tepfer

18    after that.

19          MR. REILLY:  Yes, Your Honor.  The government has

20    completed discovery in this matter with both defendants and

21    had discussions about a resolution with each of them.

22          Taking them in turn, with respect to Mr. Weissman,

23    Mr. Mazurek and I have been in contact, we have discussed a

24    potential resolution with respect to one charge.  The

25    government intends to provide an agreement with respect to

4

1    that charge to Mr. Mazurek early next week or even later this

2    week and I think we'll have some further discussions about

3    whether any enhancements or other modifications to the

4    guidelines would be applicable.  I think we're both of the

5    view, and obviously Mr. Mazurek can speak for himself, that

6    the communications and conversations are fruitful.  I also

7    think that we believe that we will know in relatively short

8    order whether Mr. Weissman is prepared to accept the

9    government's offer which will be the only offer the government

10   is extending or, in the alternative, we should set a trial

11   date with the Court.

12          So, we had discussed the possibility, if it is

13   amenable to the Court, of one additional 30-day extension of

14   time so Mr. Mazurek can review the agreement with respect to

15   his client and they can make a determination as to whether or

16   not the matter can be resolved.

17          With respect to Ms. Cardi and Mr. Tepfer, the

18   government discussed the potential of a resolution short of

19   trial with Ms. Cardi.  I believe -- I'll allow Ms. Cardi

20   obviously to address the Court more specifically on this

21   issue -- that she intends to make an application to the Court

22   that she thinks may be a necessary precursor to being able to

23   recommend a resolution to her client.  So, again, perhaps a

24   30-day extension of time might be sensible so that she could

25   then advise her client appropriately with respect to a plea.

5

1    Again, I'll allow her to address that potential application.

2              THE COURT:  Okay.  So, let me start with -- since

3    the government started with Mr. Weissman first, let me start

4    with Mr. Weissman as well.

5              MR. MAZUREK:  Yes, Your Honor.

6              THE COURT:  So, are you in agreement with the status

7    as represented by the government, Mr. Mazurek?

8              MR. MAZUREK:  Yes, Your Honor.  The government

9    informed me of a new offer just last week.  We've been in

10   discussions since then.  I do think considering this new offer

11   is advisable for me and my client and therefore request one

12   final extension.  I do think, Your Honor, at that point we're

13   either going to reach an agreement or not and we'll be

14   prepared to set a schedule if we are not able to reach an

15   agreement at the next conference and we agree to exclude any

16   time with respect to the Speedy Trial Act.

17             THE COURT:  And is your estimate the same, about 30

18   days?

19             MR. MAZUREK:  I think that's right.

20             THE COURT:  Ms. Cardi?

21             MS. CARDI:  So, Your Honor, I had some serious

22   concerns about the ability of me to adequately communicate

23   with my client.  I had serious concerns about his mental

24   health.  I submitted an order, a request for Your Honor to

25   sign an order for me to have him examined by Dr. Drob.

6

1   Unfortunately it got misdirected to a different judge, they

2   used the magistrate clerk's number rather than the criminal

3   number and it went to Judge Pollak.  That has now been

4   corrected and I understand it has recently been redirected to

5   Your Honor.

6            THE COURT:  I have to tell you I have concerns about

7   any examination done by Dr. Drob and you may want to perhaps

8   have a discussion with the Federal Defenders and their

9   mitigation specialist.  So, in a way it's sort of --

10            MS. CARDI:  I'm happen to do that.

11            THE COURT:  I'm not sure that I would have

12   necessarily granted the application, although I would have

13   granted -- you know, denied it with leave to renew.  I'm going

14   to tell you why, I have seen many evaluations done by Dr. Drob

15   and I would guarantee you that if he went around and examined

16   everybody who is here in the courtroom today, everybody

17   suffers from anxiety, PTSD and depression.  I have very little

18   confidence in his reports and I just don't find them

19   meaningful.

20            That being said, the Federal Defenders through their

21   mitigation specialists, and they're always happy to help the

22   CJA counsel and any defense counsel who wants a referral

23   obviously, they do have access to some very good mental health

24   experts who I trust can provide a meaningful evaluation.  So,

25   you certainly have leave to resubmit that.

1        MS. CARDI:  I will be doing that, Your Honor.  I

2   appreciate your candor.

3        THE COURT:  It's not going to do anybody any good.

4        MS. CARDI:  I appreciate that.

5        THE COURT:  It's just a waste of CJA funds and time.

6   It's just been my experience now over, I don't know, 14 years

7   of having seen these reports and having seen reports from

8   other experts especially in connection with my reentry court.

9        MS. CARDI:  Just so you know, Your Honor, I have

10  never worked with Dr. Drob and he was referred to me by

11  another CJA lawyer.

12       THE COURT:  He's been utilized a lot.  I think

13  probably Mr. Mazurek may have --

14       MR. MAZUREK:  I never did.

15       THE COURT:  I know from the time you were on the CJA

16  panel it is entirely possible but at least that's from my

17  perspective, I think that there are probably other mental

18  health experts out there who can provide an evaluation.  Even

19  the Federal Defenders have sort of dropped off from using him.

20       MS. CARDI:  I will resubmit, Your Honor, thank you.

21       THE COURT:  Okay.  So, I'll give you time to

22  resubmit that.  I will be away on court business this week,

23  although you'll probably need time anyway to reach out to the

24  Federal Defenders.

25       In that regard, I did receive from Probation what

1    purports to be a psychiatric evaluation from LICC which is

2    where I believe he's supposed to be getting mental health

3    treatment.  This is even worse than the Dr. Drob report.  At

4    least Dr. Drob does a fairly thorough examination, albeit

5    coming to pretty much the same conclusion every time for every

6    person.  But I don't know what to make out of this report,

7    quite honestly, and I also have very little confidence as to

8    what kind of mental health treatment the defendant is getting,

9    if at all, from this particular facility.  It's all completely

10   self-report.  There's no independent testing that was done

11   here.  I don't even really know what the conclusion is and I

12   don't know what the qualifications are of any of these people

13   who have written into this report.  It doesn't tell me

14   anything different than what I already know.  It says that he

15   is on Xanax from his primary care physician but he hasn't

16   provided any kind of documentary proof to Probation as far as

17   I'm aware of any prescription and he says he feels he's in

18   good spirits all things considered.  I don't know what that

19   means.  But it doesn't report anything other than what we know

20   already and you don't need to be a psychiatrist to know it,

21   it's his own self-report of being depressed and anxious but

22   that doesn't say anything about what's really going on.

23        So, I appreciate that Probation gave us that but it

24   does give perhaps a little bit of a window into what's going

25   on or not going on at this particular facility.  So, I gather

9

1  that you want to have an evaluation done before engaging in

2  any kind of plea discussion with the government.

3  MS. CARDI:  I do, Your Honor.

4  THE COURT:  I'm just trying to piece the two

5  presentations together.

6  MS. CARDI:  I communicated that to Mr. Reilly.

7  THE COURT:  Okay.  And the government is amenable to

8  holding open any offer pending such an evaluation?

9  MR. REILLY:  Yes, Your Honor.

10  THE COURT:  Okay.  That also brings us to the other

11  issues with Mr. Tepfer which is that -- actually I don't know

12  whether -- perhaps maybe I should just discuss adjournment, I

13  don't know whether Mr. Weisman and Mr. Mazurek necessarily

14  need to be here for that, for the rest of this because it

15  doesn't really concern your client but I can set a date for

16  now, and you'll be asking for an additional 30 days, correct,

17  Ms. Cardi?

18  MS. CARDI:  Yes, Your Honor.

19  THE COURT:  So, 30 days would take us into Passover.

20  So, I will --

21  MR. MAZUREK:  Your Honor, if I may?

22  THE COURT:  Yes, Mr. Mazurek.

23  MR. MAZUREK:  I have a trial in front of Judge

24  Rakoff in the Southern District beginning on April 16th and

25  Judge Rakoff sits all five days so I believe that -- the trial

10

1  is not supposed to last more than two weeks so perhaps we

2  could schedule a date for the week of April 29th.

3  　　　　　THE COURT:  The week of April 29th?

4  　　　　　MR. MAZUREK:  Yes.

5  　　　　　THE COURT:  Oh, I'm sorry, you said you're starting

6  April 16th, okay.

7  　　　　　Is the afternoon better for everybody or is morning

8  okay?  It makes a difference because I have the afternoon

9  available May 1st but I have pretty much the whole day

10  available May 2nd, that's a Thursday.

11  　　　　　MS. CARDI:  Your Honor, I'm available both times for

12  you, on Thursday I would be available in the afternoon.

13  　　　　　THE COURT:  On Thursday you would be available in

14  afternoon?

15  　　　　　MS. CARDI:  Yes, on Wednesday right now I'd be

16  available any time.

17  　　　　　THE COURT:  So, any preference, Mr. Mazurek?

18  　　　　　MR. MAZUREK:  No preference, Your Honor.

19  　　　　　THE COURT:  How about you, Mr. Reilly?

20  　　　　　MR. REILLY:  No, Your Honor.

21  　　　　　THE COURT:  Anything from Probation or Pretrial?

22  　　　　　PROBATION OFFICER:  No, Your Honor.

23  　　　　　THE COURT:  How is Wednesday at 2:30?

24  　　　　　MS. CARDI:  That's fine, Your Honor.

25  　　　　　MR. MAZUREK:  That's fine, Your Honor.

1          MR. REILLY:  That's fine, Judge.

2          (Pause while the Court confers with the courtroom

3     deputy.)

4          THE COURT:  Actually 3:00 might be better, I have a

5     sentencing that might go more than -- you know what, why don't

6     I just play it safe and put it on for Thursday because the

7     sentence could go for much longer.

8          How about -- you said on Thursday you're available

9     in the afternoon, right, Ms. Cardi?

10          MS. CARDI:  Yes, Your Honor.

11          THE COURT:  Okay.  So, how about 2:30 in the

12     afternoon May 2nd?

13          MS. CARDI:  That's fine, Your Honor.

14          THE COURT:  That's Thursday.

15          MR. MAZUREK:  That's fine.

16          MR. REILLY:  That's fine, Your Honor.

17          THE COURT:  Okay.  And did you say, Mr. Mazurek,

18     that your client consents to the exclusion of time?

19          MR. MAZUREK:  That's correct, Your Honor.

20          THE COURT:  And does your client as well?

21          MS. CARDI:  Yes, Your Honor.

22          THE COURT:  Okay.  An order of excludable delay

23     until May 2nd is entered as to both defendants on consent and

24     also in the interests of justice for all the reasons stated on

25     the record.

12

1          Anything else, Mr. Mazurek, as to your client?

2          MR. MAZUREK:  Nothing, Your Honor.

3          THE COURT:  All right, you and Mr. Weissman are

4    excused with the thanks of the Court.

5          MR. MAZUREK:  Thank you, Your Honor.

6          (Pause in the proceedings.)

7          (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

13

1          THE COURT:  So, as I began to say, I did receive a

2     status conference from both Probation and from Pretrial.

3     Probation's report indicates that Mr. Tepfer just refuses to

4     comply with the electronic monitoring.  He doesn't communicate

5     with Probation the way that he has been directed to do so.

6     There was some job interview that allegedly was arranged for

7     him by the Aleph Institute and he just assumes it's the

8     Aleph's responsibility to notify Probation.

9          He's a grown man and he's been on supervision for a

10    long time now and he knows it is his responsibility to report

11    to Probation and to provide documentation.

12         He allegedly went to the hospital he did not provide

13    documentation as requested and he has been admonished now many

14    times that he has to provide it, he knows this and he has not

15    done it.

16         He claims he's prescribed medication by the Long

17    Island Consultation Center, they provided that evaluation that

18    I discussed earlier, but he stops taking it because he claims

19    there are negative side effects.

20         He apparently was offered employment at the place

21    that he had the interview for but he also didn't really

22    provide documentation as requested.  He provided a business

23    card.  You can pick up a business card anywhere, you can print

24    a business card on any computer, that's not what we mean by

25    documentation, and Probation has documents that they use to

1  verify employment.  Independently Probation did verify that he

2  went to the interview but he turned down the job.

3          He claims he's not mentally sound.

4          MS. CARDI:  Your Honor --

5          THE COURT:  You know, the problem with Mr. Tepfer is

6  that he's a manipulator and I wouldn't be surprised if he's

7  actually -- this is why I do think it is good idea to have a

8  really good evaluation done because I think he's malingering.

9  New charges aside, his prior conviction is for fraud.  He is a

10 fraudster, that's what he does.  And a grand jury of this

11 district has found that there is probable cause to believe

12 that on top of that, he's committed extortion in essence to

13 defraud the Court by extorting money to pay restitution that

14 he owes on the original fraud that he committed, over

15 $7 million, and he refuses to comply with the electronic

16 monitoring and on March 12th he apparently was yelling to

17 Probation when he got contacted about his failure to comply,

18 he said, "I don't care, I'm having a breakdown, you can throw

19 me in jail, I don't care, let the judge throw me in jail, I

20 might go check myself into the hospital, just throw me in

21 jail."  So, maybe I should accommodate him and we can have him

22 evaluated from jail.

23          And then he proceeded to just walk in and out of his

24 apartment as he pleases.  He's got no stable home, he's moving

25 around from place to place and he's doing absolutely nothing

1    to help himself here.  He is not a stupid man.  The fraud that

2    he engaged in in his original conviction was a rather

3    complicated fraud and the instant case is rather

4    sophisticated.  And at this point he's not made any kind of

5    restitution at all, it's over $12 million of restitution.  He

6    hasn't even made one percent of that, and I honestly don't

7    even know what benefit, if any, he's getting from his

8    consultations at LICC.

9         He hasn't fared much better with Pretrial.  He

10   failed to report to Pretrial as directed a couple of times

11   right after a status conference here where he was specifically

12   directed to report to Pretrial and he didn't go and he claims

13   he forgot to report because he was having a hard time and,

14   again, he's always attributing it to some mental breakdown

15   about the current case.

16        He failed to report his change of address.  Pretrial

17   found out because, guess what, Probation and Pretrial are

18   talking.  Both Pretrial and Probation are recommending that

19   Mr. Tepfer's bail be revoked.

20        So, at this point I will hear from the government

21   and then, Ms. Cardi, I'll give you an opportunity to respond

22   to everything I've said.  If there's anything that Probation

23   or Pretrial would like to add, I'll have them say that first

24   so that you can respond, Ms. Cardi.

25        MS. CARDI:  Thank you.

1          MR. REILLY:  Your Honor, the government is

2    supportive of the recommendation of Pretrial and Probation.

3    I recall I think in one of our first appearances that the

4    government had referenced or discussed with the Court the

5    nature of the noncompliance.  I think I used the phrase that

6    these were technical pieces of noncompliance and the Court

7    correctly said, listen, you comply or you're not, technical as

8    it is, that's not a real term but more to the point here I

9    think is that there has been repeated chances, meaning again

10   when this case was initiated the issue of compliance in terms

11   of reporting, whether it be job search activity or compliance

12   ultimately as time went on with the location monitoring, these

13   have been repeated problems and despite the fact that Pretrial

14   and Probation have been patient and endeavored to make efforts

15   to ensure compliance and have not made a knee jerk request to

16   the Court for obviously the more significant step of seeking

17   remand, the problems haven't resolved themselves and it's not

18   simply, well, you know, effort has greatly improved save for

19   this one instance, it's repeated and, in fact, there seems to

20   be a brazenness about it now, well, fine, put me in jail if

21   that's what we should do and so, even with respect to the

22   notion of an evaluation which I think the parties are in

23   agreement, it sounds like the Court is in agreement is

24   appropriate, I have some concern about his ability to comply

25   with that, maybe not ability but willingness to comply outside

17

1  of a secure setting.

2          So, for those reasons the government joins in the

3  recommendations of the Probation Department and Pretrial

4  Services.

5          THE COURT:  Is there anything that Probation or

6  Pretrial would like to add?

7          PROBATION OFFICER:  No, Your Honor, that pretty much

8  sums it up and it is Probation's position on the matter.  I

9  would like to note that since March 1st when Mr. Tepfer had

10  screamed about throwing him in jail, so on and so forth, he

11  has not been on the location monitoring system and has not

12  been monitored.

13          THE COURT:  And for Pretrial?

14          PRETRIAL SERVICES OFFICER:  Judge, we just want to

15  add that for the technical violations -- well, violations,

16  take out the word technical, so usually we exhaust the

17  resources first in Pretrial before we run to Your Honor and

18  advise Your Honor of any noncompliance but Mr. Tepfer has

19  demonstrated that he's not capable of complying on

20  supervision, he's on post-conviction supervision and pretrial

21  supervision and he's demonstrated that he's not willing to

22  cooperate.  So, for the reasons that Your Honor said before

23  and the government and Probation, we reiterate our

24  recommendation in our report that his bail be revoked.

25          THE COURT:  Ms. Cardi?

1          MS. CARDI:  So, Your Honor, I have present in court

2     today Ms. Honey Vogel who is a representative from Aleph.

3     When Mr. Tepfer had what I would describe for the Court as a

4     breakdown at the rooming house, so the place where he was

5     living, he was no longer able to live there.  He's since been

6     residing at O El which is a Jewish organization that has taken

7     him in so that he's not homeless.  I do think, and Ms. Vogel

8     is here to address Your Honor if necessary, she's advised me

9     that she would like the opportunity to work with him in order

10    to get him connected with a mental health program that would

11    work.  She described it as -- and she could describe it for

12    you but she described it to me as a shock which essentially is

13    getting Mr. Tepfer to work with a psychiatrist or psychologist

14    that he can honestly communicate with.  His behavior has

15    been --

16          THE COURT:  In the first place, that's not how we

17    work, okay.  We have to deal with contracted health providers,

18    okay, people that have been vetted either through Pretrial

19    Services -- whether we do it through Pretrial or we do it

20    through Probation.  Considering that he is homeless, I don't

21    even know, does he have Medicaid?

22          MS. CARDI:  I don't think so, Your Honor.

23          THE COURT:  He doesn't even have Medicaid?

24          Ms. Aucoin, do you know whether he has Medicaid?

25          PROBATION OFFICER:  He previously told me that he

1    did renew his Medicaid so I believe him to have it.

2              MS. CARDI:  He has Fidelis Care.  I'm not sure

3    whether it is through Medicaid or not.

4              THE COURT:  I don't know, I think they do use

5    different health care providers to provide -- but regardless,

6    because we have to have a certain level of accountability from

7    the program and unless it is a provider that has been vetted

8    through either Probation or Pretrial, we cannot be assured

9    that we are actually going to have the level of accountability

10   that we require.

11             MS. CARDI:  So, Your Honor, as I understand it,

12   Aleph and Ms. Vogel has advised me that Aleph has worked

13   closely with Probation and Pretrial in this courthouse and she

14   is familiar with the head of I believe -- is it Probation or

15   Pretrial, Ms. Vogel?

16             MS. VOGEL:  (From the gallery)  Both.

17             MS. CARDI:  So, that they are now -- the

18   organization of Aleph is apparently known to Probation and

19   Pretrial.

20             THE COURT:  I'm also aware of Aleph, I'm very much

21   aware of Aleph, that's not the point.

22             MS. CARDI:  Okay.

23             THE COURT:  That's not the point.  The point is that

24   he needs to work with a contracted mental health provider that

25   has already been certified as approved by Probation or

1    Pretrial who are both arms of the Court.

2         MS. CARDI:  So, because of the prior relationship

3    Aleph has with Probation and Pretrial, I believe that their

4    services have been used in such a capacity with the Court on

5    other cases so there may be a synergy and a relationship

6    whereby Pretrial --

7         THE COURT:  But Aleph has been working with him

8    already for a few months and nothing has happened.

9         MS. CARDI:  Your Honor --

10        THE COURT:  Nothing has happened.  We're talking now

11   for at least two months, probably more than that because in

12   February they managed to get him, commendably, a job interview

13   and he was offered a job and he just thumbs his nose up at it

14   because the bottom line is he doesn't want to make

15   restitution.  This has been a struggle from day one since he

16   has been on supervised release in his 10-CR-600 case, a case

17   that's eight years old.  This is a constant.  He's 55-year old

18   man, he's been relying on his mother to support him.  He's

19   relying on other people to do for him.

20        That still doesn't address the fact that he's been

21   noncompliant with the reporting requirements for both

22   Probation and Pretrial and when I have both Probation and

23   Pretrial, both agencies of this Court that are known

24   nationally for their therapeutic approach to supervision and,

25   as Mr. Atkinson says, Pretrial, and I know Probation does as

21

1    well, try to exhaust every single possibility to work with

2    people and if they're at the point of throwing up their hands,

3    I don't know what else we can do because he is not amenable to

4    supervision.

5              Does he even have a cell phone?

6              PROBATION OFFICER:  Yes, he does, Your Honor.

7              THE COURT:  He does have a cell phone.  I don't see

8    how you address that.  He hasn't been compliant with

9    electronic monitoring, he doesn't care, he wants to go to

10   jail, that's what he said.

11             MS. CARDI:  Your Honor, I believe that his mental

12   health issues predate this case and have never really been

13   properly addressed by Mr. Tepfer and the family but I do think

14   that they exist and I do think that in part the inability that

15   he has to comply as he, of course, should may be symptomatic

16   of the mental health issues that he has and that's why I would

17   like another opportunity to see if I can put together

18   something that has him reporting as required and also

19   receiving the kind of mental health and community support with

20   the approval of Probation and Pretrial.

21             THE COURT:  I know that you are not his original

22   attorney in the 2010 case but rest assured, I would not have

23   ordered as part of the original sentence -- and he was given a

24   sentence of five years of Probation, he wasn't given a jail

25   sentence, I could have sent him to jail, but as part of a

22

1   special condition of supervised release he was ordered to

2   mental health treatment.  He has not cooperated with Probation

3   in that regard and so what we have now is a situation that has

4   escalated because not only has he not really complied with the

5   conditions of supervision that were originally imposed with

6   respect to mental health, with respect to employment, with

7   respect to making restitution, his reporting has always been

8   spotty with Probation, he's always got an excuse for

9   something, and we have new escalation where the violation of

10   supervised release is the commission of another felony.

11         What am I supposed to wait for, for him -- he's had

12   angry outbursts, throwing furniture and stuff around in the

13   apartment; what am I supposed to do, wait until he hurts

14   somebody or himself.  I don't know that he's being truthful to

15   anybody.

16         MS. CARDI:  Well, Your Honor, I'd like one more

17   opportunity to see if I can work with this client and with

18   Probation and Pretrial and Aleph to get him back on the right

19   track.

20         THE COURT:  Back on what right track?  He has never

21   been on the right track.

22         MS. CARDI:  So --

23         THE COURT:  He has never been on the right track.

24         MS. CARDI:  I have some faith that the providers

25   that Aleph can connect us with will hopefully be able to --

23

1      THE COURT:  What makes them different?  What makes

2  them different?

3      MS. CARDI:  I guess one of the differences is that

4  they're very familiar with the community from which Mr. Tepfer

5  comes from and some of the issues that are endemic in the

6  community in terms of mental health and familial issues but I

7  just think that if I could have one more opportunity to work

8  with him and see whether or not I can assist him in doing what

9  he needs to do going forward in this case, I know I have the

10 support of his family who are in court today, I know they're

11 very concerned about him, they're very responsive to me when I

12 need them, and an opportunity to see whether or not we can

13 assist Mr. Tepfer.  In the meantime I can also determine what

14 I believe the real mental health issues are and listen, Your

15 Honor, you may be right, I may be wrong, Mr. Tepfer may in

16 fact be a malingerer, I don't think he is but I'm not a

17 psychologist.  I do know that I have significant concerns

18 about his mental health when I communicate with him.

19     THE COURT:  According to this alleged psych report,

20 it says that he's been separated, this is from his wife; he

21 has four children, all adults, the youngest is 21, and he is

22 estranged from three of his four children for at least the

23 past three years.

24     MS. CARDI:  I think that kind of estrangement and

25 the separation from his family is symptomatic of some of the

1  mental health issues that he experiences.  I know how

2  difficult it is to deal with individuals who do suffer from

3  mental health issues, they're not always the easiest to work

4  with nor are they necessarily amenable at times but I do think

5  he has a supportive network here who want to give him the

6  opportunity.

7          THE COURT:  So, I'm going back to the docket on

8  10-CR-600 to a report from Pretrial Services dated June 22 of

9  2012 where Pretrial Services requested that the Court modify

10  the bond conditions to include mental health treatment.  So,

11  you know this has been dealt with for more than six years now

12  and, in fact, it was based on at least six months of

13  discussions and observations between Pretrial and the

14  defendant and it's more of the same, he's got stress because

15  of the initial arrest, he hasn't gotten employment because of

16  his personal and family issues, he can't handle employment, he

17  would prefer to attend counseling with a prominent rabbi in

18  the orthodox Jewish community because of his issues of a

19  religious nature and so on.  And to boot, and the reason why

20  this was ongoing for six months culminating in Pretrial

21  Services making an application to the Court was that nothing

22  came of it.  He's been given this opportunity to get his own

23  special mental health specialist and, of course, I did in fact

24  order it, I granted that application.

25          I really don't know how much more we're going to put

1  up with Mr. Tepfer's lack of compliance, I just don't

2  understand how much more are we supposed to go on with this.

3  It's a complete lack of respect for the Court and the rules of

4  the Court and the fact that he's on supervision and that he's

5  got a prior felony conviction and he can go to jail for the

6  violation and, frankly, a finding of probable cause is enough

7  for this Court to find that there has been a violation, I

8  don't need to wait for a conviction in this case, in the new

9  case.

10         Defendant is remanded.  I'm not persuaded that he is

11  going to do anything different than what has been going on now

12  for more than six years.

13         And then once you've made the application for the

14  specialist, the psychiatrist to evaluate him, he'll need an

15  order to permit him to enter MDC.

16         MS. CARDI:  Yes, thank you, Your Honor.

17         (Pause.)

18         MS. CARDI:  Your Honor, Ms. Vogel has asked if she

19  could address the Court?

20         THE COURT:  No.

21         MS. CARDI:  Your Honor, if you could put a notation

22  on there for immediate medical attention, he is on a series of

23  medications for high blood pressure.

24         THE COURT:  Do you have verification of any

25  medications because I haven't seen anything anywhere?

26

1          PROBATION OFFICER:  He showed me one prescription

2     bottle but it's hard to get a definitive answer, proof of what

3     exactly he's on right now.

4          THE COURT:  Had he complied with what he's supposed

5     to do, that when he's on medication he provide proof of that

6     to Probation, we would have a record of this.

7          (Pause.)

8          MS. CARDI:  Well, I will just say for the record so

9     that it can be -- it's high blood pressure, cholesterol,

10    sugar, I don't know if he's actually diagnosed a diabetic.

11         (Pause.)

12         MS. CARDI:  He advises me that he takes 2,500

13    milligrams a day of metformin.

14         (Pause.)

15         THE COURT:  Ms. Cardi, I did mark the detention

16    order of medical attention requested.

17         MS. CARDI:  Thank you, Your Honor.

18         THE COURT:  Thank you.

19         MR. REILLY:  Thank you, Your Honor.

20         PROBATION OFFICER:  Thank you, Judge.

21         (Time noted:  4:10 p.m.)

22         (End of proceedings.)

23

24

25