UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

UNITED STATES OF AMERICA,


    – v –                                                             No. 18-CR-524 (DLI)

MARK WEISSMAN,

                             Defendant.

------------------------------------------------------------------------x


---

## SENTENCING MEMORANDUM ON BEHALF OF MARK WEISSMAN

---

**MEISTER SEELIG & FEIN, LLP**
*Attorneys for Mark Weissman*
125 Park Avenue, 7th Floor
New York, New York 10017
Phone: (212) 655-3500
Fax: (212) 655-3535

# TABLE OF CONTENTS

I. STATUTORY FACTORS SET FORTH IN 18 U.C.S.§ 3553(a)..........................7

  A.  Mark's Life is Characterized by Exceptional Empathy and Kindness .............8

     i.  Mark Learned the Importance of Service to the Community from his Parents who Survived the Holocaust........................................................8

    ii.  Mark's Magnanimity is his Professional Hallmark ......................................9

   iii.  Generosity is the Weissman Family's Guiding Principle............................12

   iv.  Mark Routinely Performs Exceptional Acts of Kindness in his Community ...........................................................................................14

  B.  The Nature and Circumstances of the Offense....................................................17

  C.  Remorse and Post-Offense Rehabilitation .........................................................21

  D.  Collateral Consequences of Conviction.............................................................23

  E.  General and Specific Deterrence ........................................................................24

  F.  A Non-Guidelines Sentence Would Avoid an Unwarranted Sentence Disparity ...............................................................................................25

  G.  The Advisory Sentencing Guidelines ................................................................29

  CONCLUSION..............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Kimbrough v. United States,*
  552 U.S. 85 (2007) ........................................................................................................... 25

*United States v. Adelson,*
  441 F. Supp. 2d 506 (S.D.N.Y. 2006) .............................................................................. 16

*United States v. Booker,*
  543 U.S. 220 (2005) ........................................................................................................... 7

*United States v. Brettschneider,*
  18-cr-123 (E.D.N.Y. 2019) ......................................................................................... 27, 28

*United States v. Chambers,*
  17-cr-396, (S.D.N.Y. 2018) .............................................................................................. 28

*United States v. Fernandez,*
  443 F.3d 19 (2d Cir 2006) ................................................................................................ 22

*United States v. Hills,*
  16-cr-204, (E.D.N.Y. 2016) ........................................................................................ 26, 27

*United States v. Hodges,*
  07 Cr. 706, 2009 WL 36231 (E.D.N.Y. Feb. 12, 2009) .................................................. 24

*United States v. Nesbith,*
  188 F. Supp. 3d 179 (E.D.N.Y. 2016) ............................................................................. 24

*United States v. Schulman,*
  16 Cr. 442 (JMA) (E.D.N.Y. 2017) ................................................................................. 24

*United States v. Stewart,*
  590 F.3d 93 (2d Cir. 2009) ............................................................................................... 24

*United States v. Wills,*
  476 F.3d 103 (2d Cir. 2007) ............................................................................................. 25

**Statutes**

18 U.S.C. § 1512 .................................................................................................................... 27
18 U.S.C. § 3553(a) .......................................................................................................... Passim
18 U.S.C. § 3561(c)(1) .......................................................................................................... 30
28 U.S.C. § 994(j) ................................................................................................................... 6

**Rules**

U.S.S.G. § 2J1.2 .............................................................................................................. 26, 29
U.S.S.G. § 2X1.1(a) ............................................................................................................... 29
U.S.S.G. § 3B1.2(b) ............................................................................................................... 29
U.S.S.G. § 3E1.1(a) ............................................................................................................... 29
U.S.S.G. § 5C1.1 ......................................................................................................... 6, 29, 30

# EXHIBIT LIST

| Exhibit 1: Letter from Defendant Mark Weissman | |
|---|---|
| **Exhibit 2: Letters from Mr. Weissman's Family** | |
| *Name* | *Page Number* |
| Gary Krigsman | 1 |
| Duvi Rubin | 3 |
| Elie Schwab | 5 |
| Gali Schwebel | 7 |
| Moshe Schwebel | 10 |
| Aliza Weissman | 12 |
| Esther Weissman | 13 |
| Jack Weissman | 16 |
| Joseph Weissman | 19 |
| Sam Weissman | 22 |
| Sharon Weissman | 24 |
| Steven Weissman | 26 |
| Susan and Allan Weissman | 29 |
| Veronica Weissman | 31 |
| Yael Weissman | 33 |
| **Exhibit 3: Letters from Mr. Weissman's Community** | |
| *Name* | *Page Number* |
| David Apperman | 1 |
| Rabbi Shaul Arieli | 3 |
| Hillel Axelrod | 5 |
| Rabbi Yaakov Bender | 6 |
| Meir Blonder | 7 |
| Benjamin Brafman | 9 |
| Ari Buckman | 11 |

| | |
|---|---|
| Rabbi Shaya Cohen | 13 |
| Moshe Deutsch | 14 |
| David Eisig | 16 |
| Nathan Epstein | 17 |
| Ira Feder | 18 |
| Rabbi Aryeh Ginzberg | 19 |
| Bruce Goldstein | 21 |
| Richard Gordon | 22 |
| Kendra Hirth | 24 |
| Benjamin Hoch | 26 |
| Rabbi Yair Hoffman | 28 |
| Ezra Holczer | 30 |
| Steven Huttler | 33 |
| Rabbi Yehoshua Kalish | 36 |
| Uri Kaufman | 37 |
| Kerry Klein | 38 |
| Michael Laster | 40 |
| Judd Lesser | 42 |
| Mark Linchner | 44 |
| Meshulam Lisker | 45 |
| Baruch Lovett | 49 |
| Sherry and Mark Majeski | 50 |
| Enise Manjarrez | 52 |
| Steven Moskowitz | 53 |
| Phyllis Munk | 55 |
| Meyer Muschel | 57 |
| Mario Reyes | 59 |
| Katherine Rosenberg | 60 |
| Howard Slochowsky | 61 |

| | |
|---|---|
| Sherri Slochowsky | 62 |
| Leah Sochet | 64 |
| Yechiel Sochet | 66 |
| Paul Sod | 68 |
| David Sporn | 70 |
| Rafael Stefansky | 72 |
| Yechezkel Isaac Stern | 74 |
| Rueven Swerdik | 76 |
| Michael Taubenblat | 77 |
| Rita Tepfer | 80 |
| Thea Tepfer | 82 |
| Rabbi Dovid Weinberger | 84 |
| Gershon Weintraub | 86 |
| Sarah Weintraub | 87 |
| Mark Weiss | 88 |
| Michelle Weiss | 89 |
| Sam Wolf | 92 |

Mark Weissman is a good man with a really big heart. His life has been characterized by dedication to others – his family, his clients, his real estate tenants, his friends and employees, and most strikingly even strangers in need. For the overwhelming majority of his life, Mark held true to those values, as the many character letters submitted to the Court by family members and friends attest. Mark is an unusually empathetic man who gladly accepts the burdens of others as his own, and an optimist who believes that there is good in all people and that those who have consistently chosen the wrong path can be rehabilitated. At the time of his arrest on June 18, 2018, Mark worked at his father's law firm, the Law Offices of Marcel Weissman, LLC, and at his own real estate brokerage group. Mark had followed in his father's footsteps, graduating from New York University Law School in 1988, and was proudly hired by his father's firm in 1991. Mark idolized his father and wanted nothing more than to be a shining legacy to the accomplishments of his Holocaust survivor dad, who heroically remade his life by becoming a successful and respected lawyer in New York.

In 2006, Mark Weissman parlayed his success as a lawyer into the real estate investment market by opening the Weissman Realty Group LLC, while still working alongside his father at the law firm. Mark embodied the ideals of hard work, generosity, and compassion for others. He was at the pinnacle of his life and his profession – and all of that vanished in an instant when he was arrested for his criminal conduct in this case. Tragically, Mark's father died just six short months after seeing his son arrested. Due to Mr. Weissman's conviction in this case, the Law Offices of Marcel Weissman, LLC is in the process of being wound down: a legacy failed.

Now a broken man trying to pick up the pieces of a life that has been forever changed, Mark appears before this Honorable Court for sentencing. This Court is faced with the formidable task of deciding what additional punishment – beyond a ruined reputation, the

fundamental breach of his father's trust, his forfeited livelihood at his father's legacy law firm, and the destruction of his legal career and potential loss of his real estate licenses – is sufficient, but not greater than necessary, to achieve the objectives of the sentencing process.

Mark Weissman is 56 years old and has never been arrested or accused of any type of misconduct prior to these charges. His arrest was a shock to the people in Mark's community and family. To those who know and love him, Mark is a giver – not a person who would be involved in a scheme to divert money that rightly belonged to others. Mark's actions were clearly wrongheaded and crossed a line that he knew could have hurt innocent individuals, namely the Spongetech shareholders. Still, although it is no excuse for his actions, it is undisputed that Mark was not motivated by personal private gain: he did not stand to profit by his actions here. What began as an attempt to mediate a long festering hostility between two people with whom Mr. Weissman had deep and close connections (Avi Tepfer and Steven Moskowitz), turned into Mr. Weissman losing his way and crossing a line that he will forever regret. Mark understands now that in trying to mediate a dispute between Mr. Tepfer and Mr. Moskowitz arising out of their earlier Spongetech crimes, Mark overreached. He should not have taken on the obsessive mission of his lifelong friend Avi Tepfer to gain payment from Steven Moskowitz, and he certainly should not have done it at the expense of Spongetech shareholders, if, in fact, Moskowitz had money he was not reporting to the government.

Mark Weissman understood his wrongdoing at the moment he walked away from the developing scheme in May 2018. After his arrest, Mark accepted responsibility for his misconduct and has not sought to minimize it. Mark was arrested in June 2018. Shortly thereafter, Mark's father's health turned for the worse. Mark had to deal with his father's sickness and then passing in December 2018. After dealing with the sudden loss of his father,

Mark turned to what he knew he had to do: publicly admit his wrongdoing, embrace the shame and humiliation that came with it, and start down the long, painful road of redemption.

Mark's efforts to repair the damage he has caused have been extensive and swift. He accepted the government's plea agreement; admitted responsibility for obstructing justice; accepted the felony conviction with all its collateral consequences; and even cooperated with the government in providing information that he had learned about the finances of Mr. Moskowitz in the hopes that additional funds could be uncovered for purposes of repaying innocent Spongetech victims. In addition, Mark has taken steps to internalize the criminality of his conduct, and has used his hard-learned wisdom to help others avoid his fate. He took a personal ethics course and spiritual therapy sessions with Rabbi Yehoshua Kalish over the last several months to study a Jewish book called "The Path of the Just," as a way to refocus his moral and ethical compass. (Ex. 3, Letter of Rabbi Yehoshua Kalish.) Mark also collaborated with a rabbi in his community, Rabbi Yair Hoffman to produce a YouTube video addressing the Jewish principle "*dina d'malchusa dina*," or the "law of the land is the law," requiring compliance with local law as a matter of Jewish religious obligation. (Ex. 3, Letter of Rabbi Yair Hoffman.) Marks efforts serve as a warning to his community not to repeat his errors.

The damage that Mark's conduct has visited upon the people most precious to him – including his beloved father who is no longer here to see the hard steps towards redemption Mark has taken – and to those people he will never meet, the Spongetech investors, will reverberate for years. In arriving at a just sentence here, Mr. Weissman respectfully asks the Court to consider several important factors:

*First,* the Court should consider as mitigating factors Mark's family situation, personal history, and the specific circumstances surrounding the people involved here, including Avi

3

Tepfer, who Mark perceived as suffering from emotional and mental issues and being abandoned by his own family. Avi Tepfer was Mark's lifelong friend since early childhood. After Tepfer's conviction in the Spongetech case, Mark perceived a life in peril. Tepfer became destitute and estranged from his family and community. He lost his home, his wife separated from him, and his own mother evicted him from her home. He was living in cars and basements and relying on community members for shelter and sustenance. Mark even tried to hire Avi at his real estate business for a while, but Avi could not hold down that job. Mark also offered financial assistance to Avi whenever he could. Exasperated and looking for a way to get this man on some track of personal sustainability, Mark agreed to approach Steven Moskowitz on Avi's behalf, all the while knowing the great hostility felt by Tepfer towards Moskowitz. Mark should have seen the obvious, that this was the wrong path. Instead of rescuing someone in need of help, Mark worsened both of their lives. Perversely, an act intended to help a friend had the opposite effect. Mark has witnessed this through the long and arduous litigation of Mr. Tepfer's case in this same Court. He knows that Mr. Tepfer has been in and out of custody, which weighs heavily on Mark.

Notably, however, even Steven Moskowitz, one of the putative victims in this case, wrote the Court to explain that he never saw Mark's actions here to be motivated by private gain or greed. In an unusual showing of support for the offender, Mr. Moskowitz wrote this about Mr. Weissman: his actions were "an obviously misguided effort to help a friend" and are a "blip on the screen of an otherwise law-abiding and dignified life." (Ex. 3, Letter of Steven Moskowitz.)

**Second,** Mark's life of numerous, selfless acts on behalf of family, friends, and people he only tangentially knew is amply demonstrated in the more than four dozen letters submitted on his behalf. Giving back to his community and helping others in need have been constant themes

throughout Mark's life.  The breadth and depth of the letters on Mark's behalf, from so many people he has given his time and resources to help over the years, are truly remarkable.  Since the time of his arrest, Mark has redoubled his efforts to assist his tenants who were finding it hard to make rent payments, provided *pro bono* legal services for them, and even found them jobs in some instances.  The purposes of sentencing would be better served by allowing Mark to remain in the community, dedicating his time to continue to be a positive impact on these members of the community.

*Third,* Mark Weissman has already suffered enormous consequences.  His familial relationships have been fundamentally altered.  Mark will spend years proving to his children and the larger community that this one incident should not define him as a person.  Of course, Mark will never be able to show his father that he has properly gained redemption.  That loss stings hard for Mark and will be there for the rest of his days.  Professionally, Mark is in the process of winding down his father's law firm, which should have been Marcel Weissman's legacy handed down to his son and future generations.  Mark also faces the imminent prospect of not being able to practice law at all anymore – a career he has had since joining the New York State bar in 1989 – a span of 30 years.  The Attorney Grievance Committee for the Supreme Court of the State of New York, Appellate Division, Second Judicial Department, has commenced disciplinary proceedings against Mr. Weissman.  Practically, Mr. Weissman's hard-earned, spotless reputation as a lawyer is ruined and his career over.

*Fourth,* given Mr. Weissman's lack of criminal history and the parties undisputed calculation of the advisory Sentencing Guidelines, the Court should follow the Sentencing Commission's instruction and consider that because Mr. Weissman's Guidelines score falls within Zone B and he is a first-time offender involving a non-violent crime, a non-custodial

sentence is appropriate. *See* U.S.S.G. § 5C1.1, comment., n. 4 ("If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court *should consider* imposing a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3).") (emphasis added). Application note 4 to U.S.S.G. § 5C1.1 was amended on November 1, 2018 to include this specific instruction to sentencing courts to give more teeth to the often neglected Congressional mandate at 28 U.S.C. § 994(j), which directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." *Id.*

*Fifth and finally,* additional § 3553(a) factors support this recommended sentence. Mark Weissman presents zero risk of recidivism. In terms of general deterrence, Mr. Weissman's crime is unusually and oddly personal. It is highly unlikely that his punishment will have any recurring effect on others who might think of obstructing justice on behalf of a friend for no personal or pecuniary gain. Mr. Weissman's crime, a misguided attempt to help a friend "even a score" and obtain a modicum of financial security, is atypical. In any case, Mark's high-profile humiliation for his offense conduct already has been widely reported in local and national newspapers. His likely loss of his legal career and potentially his real estate career as well, due to licensing revocations, will make any other lawyer similarly situated to Mark think twice about committing a similar crime. No one will think he "got away with it" given his career downfall and his new position as a convicted felon.

Accordingly, Mark Weissman respectfully submits that a sentence of imprisonment is not warranted here. Indeed, the complete picture of how Mr. Weissman has lived his life for some

50-plus years prior to the commission of this offense, provides the strongest indication that a non-custodial sentence is reasonable and just under the federal statutory scheme.

## I. STATUTORY FACTORS SET FORTH IN 18 U.S.C. § 3553(a)

The federal sentencing system is governed by 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, 233-34 (2005). According to that section: "[t]he court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in [the federal sentencing statutes]." According to those enumerated purposes, a fair and just sentence should:

> (A) Reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). Section 3553(a) provides a list of seven factors for courts to consider in determining a reasonable sentence given the general purposes of sentencing:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed [to reflect the above-stated general sentencing goals]; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established [under the Sentencing Guidelines] subject to any amendments made to such Guidelines by an act of Congress…; (5) any pertinent policy statement . . . issued by the Sentencing Commission subject to any amendments made to such policy statement by an act of Congress…; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to the victims of the offense.

18 U.S.C. § 3553(a). These factors are more significant than the sentencing range established by the advisory Sentencing Guidelines in the Court's imposition of a sentence that is "sufficient, but not greater than necessary." *Id.*

### A. Mark's Life is Characterized by Exceptional Empathy and Kindness

#### i. *Mark Learned the Importance of Service to the Community from his Parents who Survived the Holocaust*

Mark Weissman, who is 56 years old, was born in Brooklyn, and grew up in Kew Garden Hills, Queens. He is one of four children born to Marcel and Veronica, two Holocaust survivors who fled their homes in eastern Europe, and escaped extermination by the Nazis. (Ex. 2, Letter of Veronica Weissman; Ex. 2 Letter of Joseph Weissman.) Mr. Weissman's uncle, Joseph Weissman, recalls: "when I was eight, the Nazis invaded," he and his family's "lives were never the same." (Ex. 2, Letter of Joseph Weissman.) Marcel and Joseph's immediate family members survived, but their grandparents and entire extended families perished. (*Id.*) After the war, Mr. Weissman's parents and their families immigrated to the United States, "eager to start new lives, with a strong focus on education as a means to succeed." (*Id.*) Marcel Weissman attended law school and opened a small personal injury firm, becoming an accomplished attorney before passing away last year at age 84. (*Id.*)

Like many Holocaust survivors, Marcel and Veronica Weissman focused much of their efforts on building their local community – their life's work was supporting schools and synagogues, "making sure that everyone in the community was taken care of." (Ex. 3, Letter of Michelle Weiss.) Generosity was the hallmark of Mark's childhood home. The Weissman family was "known by all to always have an open-door policy for those who were less fortunate and were known for their big heart." (*Id.*)

Mark's parents instilled these values in their children. (*Id.*) They emphasized that Mark and his three brothers should "stick together" and look out for one another. (Ex. 2, Letter of Sam Weissman.) Mark took his parents' direction to heart – his younger brother Sam always looked up to and depended on his older brother. (*Id.*) But even as a child and adolescent, Mark's

kindness was not reserved for his brothers, he also treated acquaintances with care and

compassion.   Looking back, Sam recalls:

> What impressed me most during those early years was his interactions with
> certain individuals who appeared to be lonely and isolated and were ignored by
> the community around them.  Mark was there for them, lending a hand and
> helping them adjust to the new surroundings and help them make new friends
> whether it was in camp or in school.

(*Id.*)  When Mark lived in a dormitory during high school, "he would bring home children from

broken homes" so they could spend time with the family.  (Ex. 2, Letter of Veronica Weissman.)

Mark was "always the peacemaker, he was the kid who never got angry and was always calm,

cool and collected." (Ex. 3, Letter of Meshulam Lisker.)

### ii.  *Mark's Magnanimity is his Professional Hallmark*

As an adult, Mark approached his career with the same empathy and generosity.  He

followed his father's career path, graduating from New York University Law School in 1988,

(PSR ¶ 62), and working at his father's law firm beginning in 1991.  (PSR ¶ 63.)  As an attorney,

he worked closely with his clients.  "He gave clients his cell phone number so they could reach

him day or night" and met with them at non-business hours.  (Ex. 3, Letter of Ezra Holczer.)

"His relationship with his clients goes beyond the usual attorney-client relationship as he listens

to all of their problems and always tries to assist them in resolving their issues, even those issues

unrelated to his legal representation of the client."  (Ex. 3, Letter of Kerry Klein.)  To Mark, the

law was a tool to improve his clients' lives.

In addition to the law, in 2006 Mark started Weissman Realty Group LLC.  (PSR ¶ 65.)

Employees and colleagues, describe Mr. Weissman as "decent," "humble" and "honest." (Ex. 3,

Letter of Enise Manjarrez; *accord* Ex. 3, Letter of Michael Taubenblatt ("In our business

dealings, I found Mr. Weissman to be knowledgeable, practical, capable, reliable, trustworthy

and a consummate professional.").)  Mark's business decisions are often motivated by non-

monetary factors.  "If his tenants are short/late on rent, he cuts them some slack."  (Ex. 3, Letter of Enise Manjarrez.)  Similarly, his "generosity in dealing with his in-house brokers and employees is widely known." (*Id.*)  At times he hires people simply because they need the job, without customary assurances regarding their skills, and advances salaries to commission-based brokers, even if he ultimately sustains a loss if the broker cannot close the deal.  Mark is regularly contacted by rabbis and community leaders to provide free or below market housing to those in need. (*Id.*)  "This is Mark Weissman; always caring about others and jumping into action in order to help those in difficulty at his own cost and expense."  (*Id.*)

Reuven Swerdik's experience with Mark's business is quintessential.  When he learned through his community that Mr. Swerdik's home, where he lived with his six children, went into foreclosure, Mark used his real estate skills to rescue the Swerdik family from financial ruin.  He helped the family avoid foreclosure, arranged the sale of their home for a profit, which they used to purchase a new, smaller home.  (Ex. 3, Letter of Reuven Swerdik.)  Although Mark went well beyond his professional duties, Mr. Swerdik writes, "Mark never charged us a penny.  He did it out of the goodness of his heart.  He showed us what true kindness is.  He saved a family with six small children from being thrown out onto the street."  (*Id.*)

Mark Lincher, ███████████████ was homeless and living in his car when a friend suggested that he contact "a really nice landlord who has a soft spot for tenants who were down on their luck." (Ex. 3, Letter of Mark Lincher.)  Although he was unable to provide proof of income, Mark offered him a fully renovated rental apartment.  (*Id.*)  After three months, when Mr. Lincher was unable to keep up with the rent, he accepted partial payment until Mr. Lincher found a new job.  To Mr. Lincher, Mark "is truly an angel." (*Id.*)  This generosity is typical of Mark.  As Sherri Slochowsky, an employee of Weissman Realty reports: "I have dealt with some

of his tenants who have fallen on hard times, where he decides not to evict even when he is owed a great deal of money." (Ex. 3, Letter of Sherri Slochowsky; *accord* Ex. 3, Letter of Katherine Rosenberg (discussing an instance where Mark allowed an unemployed divorcee to remain in her apartment, although she was unable to pay rent).)

Ms. Slochowsky recalls that one of her first projects was trying to find a home for a rabbi who was living in a motel with his elderly mother. (Ex. 3, Letter of Sherri Slochowsky.) Unable to locate an appropriate ground floor apartment, Mark purchased a three-family home and made a space for the rabbi and his mother. He also regularly brought them food at the motel while they waited to move into their new apartment. (*Id.*) Similarly, Mark once purchased a property at a foreclosure auction, and learned thereafter that the tenants were being evicted. "He felt so bad for them" that he offered them "way below market rent in one of his other properties until they could get back on their feet again." (Ex. 3, Letter of Yechezkel Isaac Stern.)

Mr. Weissman was equally gracious with his employees and their families. Shortly after Ms. Slochowsky began working at Weissman Realty, her husband was forced to sell his business and had trouble finding work. (Ex. 3, Letter of Howard Slochowsky.) Mark was there to help. Mr. Slochowsky writes: "Though he barely knew me personally at the time, Mark helped me sort through many issues and challenges . . . reviewing documents and helping guide me through this difficult time in our lives." (*Id.*) Mark also helped the Slochowsky family by encouraging Ms. Slochowsky to become a real estate agent, allowing her to earn commissions and help support the family. (*Id.*; *see also* Ex. 3, Letter of Katherine Rosenberg (describing how Mark continued employing an individual to allow her to support her family, although she was not "well suited" to the job).) An employee of Mark's perhaps describes his quiet charity best: "The one thing I could assure you about Mark is that it is highly unlikely that anyone knows the full gamut of the

acts of kindness he does for others, be it for his friends, for his family, or for a stranger." (Ex. 3, Letter of Yechezkel Isaac Stern.)

### iii.     *Generosity is the Weissman Family's Guiding Principle*

Following his own parents' model, Mark and his wife Sharon have imbued their family home with generosity and compassion. His close-knit family, including their four daughters, three sons-in-law, eleven grandchildren, and Mark's mother, Veronica, regularly spend time together. Since Mark's father passed away last year, Mark visits his mother, who lives a few blocks away, on a daily basis. Those visits mean the world to Veronica Weissman: "Now that I am widowed, I find myself completely dependent on him. Each day Mark brings me groceries and good cheer. His visits keep me alive." (Ex. 2, Letter of Veronica Weissman.)

Mark and Sharon raised their children to value service. Sharon Weissman credits "the exemplary manner in which [Mark] has lived his life and the tone he has helped set in our home" for their daughters' upbringing, allowing them to grow into "four accomplished and fine young women." (Ex. 2, Letter of Sharon Weissman.) Indeed, Mark and Sharon's daughters have all entered professions assisting those in need. Aliza (31) is a speech pathologist at a school for special needs children. Esther (29), who has a Master's Degree in Education, is a high school teacher. Gali (27) studies nutrition and plans to become a registered dietician. And, Yael (19), the youngest, is studying to become a social worker. (*Id.*)

Mark's daughters learned the importance of empathy in their family home, which his daughter Gali describes as "always open to all" especially those without a place where they were "comfortable and accepted." (Ex. 2, Letter of Gali Schwebel.) But, the Weissmans do not "just welcome people by giving them a meal to eat or a bed to sleep in, they also [make] them feel special, loved and respected" and give them confidence "to get through whatever challenges they

were facing." (*Id.*)  Gali writes that "when my friends would go to play together on Shabbos afternoons, I accompanied my family to visit an elderly childless couple to play games with them and bring smiles to their faces." (*Id.*)  "When others had bat mitzvah parties for friends, I had my bat mitzvah party in an orphanage with another twelve-year old girl [who] my parents sponsored." (*Id.*)  And "when others spent their busy Fridays getting ready for Shabbos my parents prepared ahead so that they could take in a girl my age who was brain damaged at birth." (*Id.*)  "Probably the most amazing thing is that we never resented the time that my parents took to help or guide others.  We actually appreciated it because it was so genuine, so real, and so a part of who they were." (*Id.*)

Mark's daughter Esther explains: "both of my parents modeled and encouraged us children to give to others who were in less fortunate circumstances." (Ex. 2, Letter of Esther Weissman Rubin.)[1]  The Weissmans encouraged Esther and her sisters to give of their own time, in a manner anathema to many modern teenagers:  Esther and Aliza enrolled in a program that trained them to become "medical clowns" in which they would go to nursing homes and hospitals to cheer up the patients. (*Id.*)  Similarly, the Weissmans encouraged their daughters to work at a summer camp for children with cancer and other serious diseases. (*Id.*)

The Weissmans' "kindness and generosity" sets a powerful example for others to follow. (Ex. 3, Letter of Moshe Schwebel.)  Gali's husband, Moshe, writes "my in-law's home has a revolving door that is always open to lonely and needy people" and that they have "ingrained in [their] children the importance of helping others." (*Id.*)  Mark and his wife are a role model for

---

[1] In her letter to the Court, Esther describes a dozen specific instances of the Weissmans' good deeds, using pseudonyms to protect the recipients' privacy.  Should the Court require submission of these individuals' names, we respectfully request permission to do so under seal.

their children, as they and their spouses "look for ways to help the needy in our community as well." (*Id.*)

Entering the Weissman family has had a similarly profound impact on his son-in-law, Duvi Rubin. (Ex. 2, Letter of Duvi Rubin.) He recalls his first Friday visit to the Weissman home when he was introduced to a "mentally ill teenaged girl" who the Weissmans helped raise. (*Id.*) The "extent of the relationship" became clear to Mr. Rubin when he heard the young girl call Sharon Weissman "mommy." (*Id.*) "The opportunity to give a fellow human being the chance to build a stable and meaningful life was and continues to be one of [Mark's] hallmark attributes." (*Id.*)

### iv.     *Mark Routinely Performs Exceptional Acts of Kindness in his Community*

More broadly, Mark "gives of his own time and provides friendship to those who have difficulty in their lives." (Ex. 3, Letter of Benjamin Hoch.) "Local organizations know the [Weissmans'] thoughtful, helpful and sensitive nature, would turn to them to help in these such cases, and were rarely refused. In his home, they became family members and eventually healed, improved and thrived." (Ex. 2, Letter of Gary Krigsman.) Their good acts set an example not only for their daughters, but for the community as a whole.

Rabbi Yair Hoffman, the former dean of a "high school for young ladies who were from broken homes" extols the Weissmans' dedication to mentoring his former students: "in all my years in education and community service, I have never met someone as remarkably selfless as Mark Weissman and his wife, Sharon." (Ex. 3, Letter of Rabbi Yair Hoffman.) For example, after "the challenges of life had left" one young woman "emotionally broken and dejected," Mark and his wife took her into their home, "built up her self-esteem and provided a warm, loving environment for her to bloom." (*Id.*) Because of the nurturing she received from the Weissmans, she has grown into a thriving adult, who is happily married with three children. (*Id.*)

Meyer Muschel, an attorney and Mark's long-time friend, describes another young girl in need, whom the Weissmans brought into their home. (Ex. 3, Letter of Meyer Muschel.) They treated her like a member of the family, funded her education and helped her find a husband. (*Id.*) "These acts were always done without fanfare or recognition. Nonetheless, the Weissmans' kindness and compassion was so legendary that others who knew of it would actually volunteer Mark or his wife Sharon . . . without seeking their permission in advance." (*Id.*) Mark's friend, Meyer Muschel, expressed this same sentiment: "I have observed, often with sheer awe, the acts of kindness and compassion constantly flowing from the Weissman home to so many in need." (Ex. 3, Letter of Meyer Muschel.)

Leah Sochet also benefited from Mark's extraordinary generosity. (Ex. 3, Letter of Leah Sochet.) Ms. Sochet's mother, who has since passed away, required kidney dialysis three times per week. On Fridays, as families prepared for the Sabbath, there was no one who could watch Ms. Sochet and her autistic sister while her mother received her dialysis treatment. (*Id.*) So, Mark "graciously offered his time and his home every Friday." (*Id.*) According to Ms. Sochet: "This was no small feat, as [her] sister needs constant care and supervision and has frequent tantrums." Mark continued this weekly tradition for ten years, "long after the need for this arrangement had passed." (*Id.*)

The Weissmans also supported Ms. Sochet and her sister in other ways. For example, when the Sochets home could no longer accommodate Leah's mother's medical equipment with space to spare for Leah to live a normal life, Mark raised money to purchase the home. (Ex. 3, Letter of Yechiel Sochet.) When Leah got married, and her father, Yechiel Sochet was unable to pay for the wedding, "Mark's charitable heart made this beautiful event." (*Id.*) The Sochets "were always so grateful to receive his help, and Mark did so in such a discreet and sensitive

manner that we never felt ashamed or embarrassed . . . he treated us like equals, with respect and dignity and never came across as haughty." (*Id.*) In summarizing the impact of Mark's generosity, Mr. Sochet shares this touching anecdote: "I am addressed by my autistic daughter as 'Abba' – father in Hebrew. But when she sees Mark, she excitedly calls him 'Daddy' – as his children address him. Yes, this non relative is, and has become, Daddy to my autistic daughter." (*Id.*) And, Ms. Sochet candidly explains "I wonder where I would be today had I not been the recipient of Mark's financial and emotional support over these past years." (*Id.*)

Kendra Hirth also benefitted greatly from Mark and Sharon Weissman's kindness. (Ex. 3, Letter of Kendra Hirth.) Ms. Hirth was widowed at the age of 24, and soon found herself responsible for caring not just for her new baby, but for her deceased husband's parents. (*Id.*) In this moment of need, the Weissmans became "surrogate children" for her in-laws, visiting regularly and helping to care for them. "They were a tremendous support system for me as a young widowed mother and I will always be grateful to them for that." (*Id.*) Sadly, her aging father-in-law "was slowly forgotten by the people around him. But not by Mark and Sharon." (*Id.*) For example,

> Mark arranged for the synagogue members to come visit [his] house every Sukkot holiday and sing and dance with my father in law . . . . The effort that Mark put in to gather the men and children to let my in-laws know they weren't forgotten was heartwarming. To me this shows that Mark will always go the extra mile to ease another's pain and suffering. His charity comes from the heart.

(*Id.*)

Mark's truly exemplary kindness – towards his family, colleagues, clients, and community – weighs heavily in favor of a non-custodial sentence. "[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

### B.     The Nature and Circumstances of the Offense

18 U.S.C. § 3553(a)(1) provides that in determining the appropriate sentence, Courts should consider "the nature and circumstances of the offense."  As explained in the opening section to this memorandum, Mr. Weissman's offense conduct here was both perplexing and unusual.  He knew better than to help Avi Tepfer carry out an attempt to gain money from Steven Moskowitz.  On the other hand, Mark took this extreme risk at no direct benefit to himself.  Perversely, in attempting to make things better for a destitute friend, he damaged both his friend's life further and his own.

Mark Weissman and Avi Tepfer were childhood friends, having met in the first grade.  They attended Yeshiva together and remained in touch, attending each other's family and social events.  They would see each other for meals, religious events, community gatherings and more.

After Tepfer's conviction in the Spongetech case, Tepfer's life went into a tailspin.  He became destitute, estranged from his family and community.  He lost his home, and his wife separated from him.  Eventually, even his own mother evicted him from the family home.   As a result of his conviction, Avi was "shunned by his entire family and left bereft without any friends or anyone he could go to for some compassion." (Ex. 3, Letter of Rabbi Aryeh Ginzberg.)  This abandonment made Tepfer's life much worse, as he was forced to live in cars and basements and began relying on community members for shelter and sustenance.  As others shunned him, Tepfer began to rely more heavily on Mark for support.  Mark raised money for Tepfer, and found Avi a place to live and even gave him a job.  Mark "made sure to call anyone and everyone to help Avi find a job and also to help with his wife and children." (Ex. 3, Letter of Meshulam Lisker.)  Mark even wrote a letter to Avi's probation officer, explaining his efforts to help Avi find a job, and appealing for permission for Avi to attend his son's wedding in

Australia.  But Tepfer's erratic and aggressive behavior made him increasingly difficult to help.  As Tepfer became more embittered, he urged Mark Weissman to approach Steven Moskowitz for financial assistance to make good for Mr. Moskowitz's getting Tepfer involved in Spongetech to begin with.

Moskowitz was the former CEO of Spongetech, and the person who involved Tepfer in the sale of Spongetech stock.  It is this involvement with Spongetech that caused Mr. Tepfer eventually to blame Mr. Moskowitz for his current state of despair.  Spongetech turned out to be a Ponzi scheme, and both Messrs. Moskowitz and Tepfer pleaded guilty to securities fraud-related crimes arising from the business.  Both Moskowitz and Tepfer were sentenced to terms of probation for their crimes, pursuant to written plea agreements with the government.  Both men were also subject to a joint and several restitution order of approximately $12 million from that case.

After Tepfer's isolation from family and friends following his Spongetech conviction, he turned to Mark Weissman to seek financial relief from Moskowitz, whom Tepfer blamed for getting him involved with Spongetech in the first place.  Tepfer might have asked for Mark's involvement because Mark was related to Moskowitz through marriage.  Mark's cousin Alan is married to Steven Moskowitz's sister, and Mr. Tepfer also knew that Mark had known Moskowitz for more than thirty years.

When Tepfer urged Mark to get money from Moskowitz, Mark should have run the other way.  Instead, he agreed to meet with Moskowitz on Tepfer's behalf.  Mark felt that based on his relationships with both men, he could mediate between the two.  He hoped that he could help Tepfer get his life back on track, and avoid any confrontation with Moskowitz.  In Mark's

first meetings with Moskowitz, he proposed that Moskowitz provide a job for Tepfer. Moskowitz refused, and instead suggested making a direct payment.

Mark communicated this to Tepfer and began to work with Moskowitz to arrange a financial payment to Tepfer from an alleged overseas bank account that Moskowitz claimed to have, presumably as a way of avoiding payment on the outstanding restitution court order. Instead of refusing to participate in such a scheme, Mark carried on with the plan. He regrets this decision daily.

Mark's lamentable involvement in this foolish plot was sporadic – he attended two meetings in early 2017, and did not become involved again until March 2018. When things started becoming more concrete, and money was alleged to be about to be transferred, he withdrew from the plan, telling others he no longer wanted to be involved. (PSR ¶ 19, at 6.) Clearly, this was far too little too late.

Mark knew what he was doing was wrong. What is perplexing is why a man who had accomplished so much in his life, would risk so much for someone who was not family and from whom Mark expected no benefit. Although nothing excuses Mark's conduct, understanding his motivation is relevant to the Court's imposition of punishment. Mark was frustrated that he was unable to help Tepfer get his life back on track and became obsessed to get something done for him. Raising money for Tepfer had not worked; networking to find him a job failed because of Tepfer's erratic behavior; and Tepfer refused to seek the psychiatric help he needed. Mark's involvement with Moskowitz initially was just another way of trying to solve Tepfer's problems. Sadly, he agreed to cross a line to get it done.

Steven Moskowitz's sister, Susan, married Mark's cousin, Allan Weissman. Together, they wrote the Court on Mark's behalf from the perspective of the Moskowitz family. Susan

Weissman wrote: "[Our] reaction was . . . magnified when we later learned that [Mark's] actions involved, among others, our own brother and brother-in-law, Steven Moskowitz. I feel it necessary to relate to Your Honor that whatever misguided and criminal activity was unfortunately committed, it was done at the behest of others, and it was done for the sake of improving the situation of others. While I realize that does not excuse criminal behavior, I hope that it does reduce the severity of the behavior in the eyes of the court." (Ex. 2, Letter of Susan and Allan Weissman.) Thus, even the Moskowitz family seeks the Court's mercy on mark Weissman for his errant behavior on behalf of Avi Tepfer.

Those who know Mark and Avi Tepfer well knew that Mark had a "genuine soft spot" for Avi, whose "life and mental health ha[d] seriously spiraled downhill over the last several years. (Ex. 3, Letter of Rabbi Shaul Arieli.) "It is my belief," the Rabbi writes, that Meyer's eagerness to help an old friend led him astray." (*Id.*) Rabbi Dovid Weinberger, who has been close with the Weissman family for more than two decades, suggests that Mark, in his "quest to do good" for Avi, became blind to the wrongfulness of his conduct and thus lost his "compass of reality and the law." (Ex. 3, Letter of Rabbi Dovid Weinberger.)

Meir Blonder, who attended elementary school with both Mark and Avi, writes, "I know [Avi's situation] took a toll [on Mark]. It is difficult to watch a lifelong friend's life unravel and to carry the huge weight of support for many years. Avi became in every sense of the word a charity case and Mark personally took on the burden of rallying others to assist Avi." (*Id.*) "He always looked out for [Avi] even when we all gave up on him. [Avi] was a human being and Mark always looked out for every person because he felt they deserved a chance. Especially when [Avi] was very vulnerable and sometimes unstable, Mark still went to bat for him." (Ex. 3, Letter of Meshulam Lisker.)

Thus, when Mark decided to meet Moskowitz to help Avi, Mark already felt he had failed his friend from succumbing to his desperate plight. It is under these unfortunate circumstances that Mr. Weissman then also lost his way. Whatever his motivations, however, Mark now realizes that his conduct was inexcusable and wrong. He acknowledges that he actually made things worse for his friend and, in the process, hurt his relations with another friend and in-law, Mr. Moskowitz.

### C.     Remorse and Post-Offense Rehabilitation

Since his arrest and guilty plea, Mark has been "consumed by shame and remorse" for the wide-ranging impact on his criminal conduct. (Ex. 1, Letter of Mark Weissman.) Mark expresses: "I am ashamed of the dishonor I have brought on my family and my profession." (*Id.*) Mark "loved being a lawyer" and "looked forward to the honor of taking over the firm [his] father founded." (*Id.*) But that is not to be: "that firm is winding down, and [my] father's legal legacy will end," as Mark says, "all because of me." (*Id.*) He is also consumed with concern over how this case has affected his family – particularly his aging mother. Mark and his mother are neighbors, and he has observed her daily struggle "with the anxiety of [his] legal situation." (*Id.*) Mark is chastened by the toll his actions have exacted on his mother: "I am so ashamed that I have added to her burden at this time in her life." (*Id.*) He will "forever live with the consequences." (*Id.*)

Mark has also "spent this time trying to come to terms with [his] actions," internalizing the "impact of [his] actions on the victims of the Spongetech fraud." (*Id.*) He "now see[s]" that impact "with clarity." (*Id.*) He "see[s] how people are still struggling to make ends meet years after that case ended," and is "deeply sorry." (*Id.*) Mark is clear about the gravity of his error: "I lost my way. I failed. I failed to follow the ethical rules that have guided my personal and

21

professional lives, and I failed to follow the law." (*Id.*) His only hope is that by "remain[ing] committed to helping others and to improving [his] community . . . one day, [his] future good acts will come to eclipse [his] actions in this case." (*Id.*)

Mark Weissman not only has accepted responsibility for his actions, but has taken proactive steps to help the Spongetech investors locate funds for payment on the outstanding restitution owed to them. As the government conceded in its letter to the Court and in the Weissman PSR, Mark has provided extensive information to the government with respect to Mr. Weissman's understanding of the current financial state of Mr. Moskowitz's ongoing businesses. This information was given to the government and federal agents for purposes of ensuring that the Spongetech investors are getting their fair share from Moskowitz's profits so long as the restitution order remains unpaid. Where, as here, a defendant has attempted to provide information to the government that might assist it in collecting restitution for victims of an offense, a downward variance may be warranted. *See United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) (holding that a court may consider as a mitigating factor "efforts to cooperate, even if those efforts did not yield a government motion for a downward departure pursuant to U.S.S.G. § 5K1.1.").

Others close to Mr. Weissman have also expressed to the Court the scope and depth of Mark Weissman's remorse for his conduct in this case. Rabbi Weinberger writes that Mark has fully internalized the message that he acted wrongfully in this case, regardless of his initial intent. Rabbi Weinberger explains that Mark has become focused on the idea of "total respect and subservience to the law of the land" and "has committed that in all future activities of helping others in need, he would first have to discuss it with his Rabbis and his family, thus

preventing any possibility of inappropriate actions in the future." (Ex. 3, Letter of Rabbi Dovid Weinberger.)

Further, Mark has turned towards the teachings of Judaism to guide his path forward. Rabbi Yehoshua Kalish, the Rabbi of Mark's congregation in Lawrence, writes that Mark "has expressed his deep regret for violating the law" and asked to work together to study a Jewish book of ethics called, "The Path of the Just." (Ex. 3, Letter of Rabbi Yehoshua Kalish.) "He explained that he felt it was necessary for him to study this highly regarded book so that it could provide him with the proper moral guidance" to prevent any future wrongdoing. (*Id.*) After several weeks of study, Rabbi Kalish reports that Mark "was a serious student who demonstrated his willingness to adopt the lessons that he learned from this book into his life." (*Id.*)

Mark's brother, Jack Weissman, writes that Mark "regrets his actions and is utterly remorseful." (Ex. 2, Letter of Jack Weissman.) Jack Weissman laments the consequences of Mark's expected disbarment, and the "immediate loss of the law firm he and our father worked countless years to build." (*Id.*) "This is painful to all of as in as much as our father died knowing the dream he had, for Mark to inherit the practice, would go unfulfilled." (*Id.*)

**D.      Collateral Consequences of Conviction**

As noted throughout this memorandum, Mark will face substantial collateral consequences as a result of his felony conviction. (PSR ¶ 84.) Most significantly, he will likely lose his ability to practice law at least for some time, and potentially forever, because he is facing disciplinary proceedings before the New York State Bar following entry of this judgment. He has already been denied renewal of his real estate broker license as a result of his plea.

As discussed above, Mark's law practice and real estate business are not only the means by which he supports his family, but also represent a central part of his identity. The prospect of

losing these licenses has been deeply painful.  The winding down of his father's law firm is particularly painful to Mr. Weissman.  This firm was meant to be a lasting legacy and tribute to a heroic Holocaust survivor who overcame unthinkable circumstances to succeed and prosper in a foreign land as a distinguished "officer of the court."  In this way, Mark failed his father.  This alone is substantial and permanent punishment to him.  *See United States v. Stewart*, 590 F.3d 93, 141-42 (2d Cir. 2009) (consideration of the "collateral effects of a particular sentence" is an essential part of the calibration of a "just punishment"; "the conviction itself already visits substantial punishment"); *United States v. Schulman,* No. 16 Cr. 442 (JMA) [Dkt. No. 155] (E.D.N.Y. Oct. 6, 2017) (variance is warranted from Guidelines where reputational ruin and being forced out of professional career and the industry in which the defendant worked was "substantial and meaningful punishment," and where defendant's "emotional well-being suffered as a result."); *see also United States v. Nesbith,* 188 F. Supp. 3d 179 (E.D.N.Y. 2016).

In addition to losing the two licenses he relies on for his livelihood, Mark faces additional collateral effects, including bars on working in certain industries.  These significant hardships he faces weigh in favor of a non-custodial sentence.  *See, e.g., Nesbith*, 188 F. Supp. 3d at 196 (sentencing a defendant whose advisory sentencing range was 33-41 months to one year of probation, in part, because her felony conviction will make it unlikely that she could pursue a teaching career.)

### E.    General and Specific Deterrence

Specific deterrence has been accomplished.  Whatever sentence the Court imposes, Mark Weissman will carry this conviction for the rest of his life.  The experience of being arrested and convicted has deeply impacted Mark.  He is deeply ashamed of his conduct, and greatly distressed by the impact that his actions have had on his family.  He also clearly understands the

wrongfulness of his actions, both legally and morally. (See section C, *supra*.)  He is 56 years old, and even this fact, predicts that he is at a very low risk to re-offend. *See United States v. Hodges*, No. 07 Cr. 706, 2009 WL 36231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting that "post-*Booker*, courts have observed that recidivism is markedly lower for older defendants" and collecting cases).

As for general deterrence, there can be no doubt that the prosecution of this unusual case alone will deter any similarly situated professional or even obsessive friend from ever considering obstructing justice to somehow "even a score" or make things better for a destitute friend.  As stated previously, this case presents a peculiar fact pattern.  Anyone who hears about this case in the press or court reports would never think Mark Weissman "got away" with anything by not getting a term of imprisonment in addition to his loss of professional licenses, the closing of his law firm, reputational damage and permanent felony conviction – all of this for doing something for which he stood to gain nothing personally.  These consequences clearly indicate that all people will be held accountable for their actions if they break the law – regardless of motivation or desire.

### F. A Non-Guidelines Sentence Would Avoid an Unwarranted Sentence Disparity

Although the primary duty of a sentencing court is to render a just sentence in light of each defendant's particular circumstances, as part of its individualized sentencing analysis the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6); *see also United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007) (explaining the "primary purpose" of § 3553(a)(6) is "to minimize nationwide disparities"), *abrogated on other grounds, Kimbrough v. United States*, 552 U.S. 85 (2007).  The statute requires the Court to examine the

criminal conduct upon which the defendant's conviction is based, and in sentencing the defendant, consider the sentences by other courts nationwide for similar criminal conduct.

By the Sentencing Commission's own account, a sentence within the advisory Guidelines recommendation of 6-12 months would create precisely such an unwarranted disparity. Specifically, in both 2018 and the third quarter of 2019, over 50% of defendants sentenced under U.S.S.G. § 2J1.2 received a downward departure or variance from their advisory Guidelines ranges. *See United States Sentencing Commission Quarterly Data Report, 3rd Quarter Release Preliminary Fiscal Year 2019 Data Through June 30, 2019*, Table 11[2] (64 of 103 defendants sentenced under § 2J1.2 through June 30, 2019 received a downward departure or variance); *United States Sentencing Commission Quarterly Data Report, Fiscal Year 2018*, Table 11 (72 of 136 defendants sentenced under § 2J1.2 in 2018 received a downward departure or variance).[3] Moreover, in the last two years, a large portion—over a quarter—of all defendants sentenced for all types of administration of justice crimes received a non-custodial sentence. *United States Sentencing Commission Quarterly Data Report, 3rd Quarter Release Preliminary Fiscal Year 2019 Data Through June 30, 2019*, Table 17 (28.8% of defendants sentenced for administration of justice crimes were sentenced to probationary or alternative sentences); *United States Sentencing Commission Quarterly Data Report, Fiscal Year 2018*, Table 17 (27.7% of defendants sentenced for administration of justice crimes were sentenced to probationary or alternative sentences).

---

[2] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_3rd_FY19.pdf.

[3] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2018_Quarterly_Report_Final.pdf.

In addition to this statistical evidence, there is anecdotal evidence in the case law to support a non-custodial sentence as well. Several recent local cases illustrate this trend. Lydia Hills, who was sentenced on November 8, 2019, was likewise an attorney convicted of the same offenses as Mark. *See United States v. Hills*, 16-cr-204, Indictment [Dkt. 15] (E.D.N.Y. Apr. 20, 2016) (Glasser, J.).[4] Ms. Hills was convicted following trial of conspiring to obstruct, and obstructing, the collection of a $4.9 million restitution judgment and a $13.5 million forfeiture order that had been imposed in a 2010 fraud case. *See United States v. Hills*, 16-cr-204, Gov't Sentencing Memorandum, [Dkt. 130] (E.D.N.Y. Oct. 25, 2019). In committing her offense, Ms. Hills used her position as an attorney and real estate broker in falsely asserting to the U.S. Attorney's Office that her co-defendant would not receive any proceeds from the sale of certain properties. *Id.* In that regard, Ms. Hills' offense was more egregious than Mark's—although he is an attorney, he was not acting in that capacity in committing the conduct at issue. Still, Ms. Hills received a non-custodial sentence of four years' probation, although her advisory Guidelines exceeded Mark's.[5]

In *United States v. Brettschneider*, 18-cr-123 (E.D.N.Y. 2019), Mr. Brettschneider, who like Mr. Weissman was an attorney, was convicted of obstruction of justice based on evidence that he conspired to make false statements to the Bureau of Prisons to help reduce a client's

---

[4] Ms. Hills was charged with both conspiring to obstruct an official proceeding under 18 U.S.C. § 1512(k), and obstruction of an official proceeding, under 18 U.S.C. § 1512(c)(2). She was convicted on both counts.

[5] The Court's Guidelines' calculation does not appear on the docket, but according to both the government and Ms. Hills, her advisory Guidelines range included a higher term of imprisonment than Mark's. *See United States v. Hills*, 16-cr-204, Gov't Sentencing Memorandum, [Dkt. 130] at 39 (E.D.N.Y. Oct. 25, 2019) (arguing that Ms. Hills' advisory Guidelines range was 27 to 33 months); *United States v. Hills*, 16-cr-204, Defendant's Sentencing Memorandum, [Dkt. 127] at 29 (E.D.N.Y. Oct. 4, 2019) (arguing that Ms. Hills' advisory Guidelines range was 10 to 16 months).

sentence.  Mr. Brettschneider, who had abused his position as an officer of the court to assist a client's case, received a sentence without a period pf incarceration.  Although his advisory Guidelines' range included potential jail time of up to 6 months, *United States v. Brettschneider*, 18-cr-123, Government Sentencing Mem. at 1, 5 [Dkt. 240] (E.D.N.Y. 2019) (Amon, J.), he received four years' probation, with 60 days in a community confinement center, and 80 hours of community service.  *United States v. Brettschneider*, 18-cr-123, Amended Sentencing Judgment [Dkt. 241] (E.D.N.Y. July 26, 2019).

*United States v. Chambers* is similarly instructive.  *United States v. Chambers*, 17-cr-396, Sentencing Tr. [Dkt. 105] (S.D.N.Y. Nov. 20, 2018) (Pauley, J.).  Like Mark, Mr. Chambers was an attorney, who was convicted after trial of using his position to repeatedly bribe an N.Y.P.D. officer in connection with licenses for firearms.  *Id.* at 16.  This conduct was significantly more serious than Mark's – it both directly involved use of Mr. Chambers' position as an attorney, and involved proliferation of dangerous weapons.  Mr. Chamber's Guidelines calculation was concomitantly higher than Mark's:  his offense level was 22, and his advisory Guidelines range was 41 to 51 months of imprisonment.  *Id.* at 10:10-14.  The Court substantially varied downward from the advisory Guidelines, imposing a sentence of 12 months and one day.  *Id.* at 21:20.  Given the sharp contrast between Mark's and Mr. Chambers' conduct, a non-custodial sentence is warranted here.

In sum, the aforementioned statistics and case evidence reveal that courts in this Circuit, and nationwide, have imposed ever fewer Guidelines sentences on defendants convicted of obstruction of justice offenses.  Moreover, the proportion of similarly situated defendants who have received non-custodial sentences also has continued to increase.  Sentencing Mr. Weissman

within his advisory Guidelines range would thus cause precisely the unwarranted disparity that § 3553(a)(6) instructs the Court to avoid.

### G. The Advisory Sentencing Guidelines

The parties and the Probation Department agree that the total offense level pursuant to the advisory sentencing guidelines is 10. Mr. Weissman has zero criminal history points, placing Mark in Criminal History Category I.

The advisory Guidelines calculation is as follows:

| | |
|---|---|
| Base Offense Level | 14 (U.S.S.G. 2X1.1(a) and 2J1.2(a)) |
| Adjustment for Role in the Offense | -2 (U.S.S.G. 3B1.2(b)) |
| Acceptance of Responsibility | -2 (U.S.S.G. 3E1.1(a)) |
| Total Offense Level | = 10 |

At total offense level of 10, in Criminal History Category I, places Mr. Weissman in Zone B of the Sentencing Table. Although the Sentencing Table indicates a range of imprisonment of 6 to 12 months, § 5C1.1(c)(3) directs that the minimum term may be satisfied by a sentence of probation that includes a condition of home detention. Application Note 4[6] further directs that the Court "should consider a sentence other than a sentence of imprisonment in accordance with subsection (b) or (c)(3) … if the defendant is a non-violent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table." U.S.S.G. § 5C1.1,

---

[6] Application Note 4 to section 5C1.1 was added to the Sentencing Guidelines on November 1, 2018 (amendment 811). This amendment attempted to encourage sentencing courts to consider more sentences without incarceration for first-time non-violent offenders, after a recent Commission recidivism study demonstrated that offenders with zero criminal history points have a lower recidivism rate than offenders with one criminal history point, and that offenders with zero criminal history points and no prior contact with the criminal justice system have an even lower recidivism rate." *See* Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* at 6–9 (2017).

comment. n. 4 (2018). Mark meets these criteria. The offense of conviction is "non-violent," and he has no prior law enforcement contacts of any kind. *Id.*

Thus, even the starting point for federal sentencing purposes, the calculation of the advisory Sentencing Guidelines, indicates that the Court "should consider" a sentence that does not include a term of incarceration.

## CONCLUSION

For all the reasons detailed above, sentencing Mark Weissman to a term of incarceration would be greater than necessary to achieve the federal statutory goals of sentencing. We respectfully submit that based on the many detailed factors cited above, a downward variance from the Guidelines is appropriate here to impose a sentence of probation under 18 U.S.C. § 3561(c)(1). *See* PSR, ¶ 78, at 16. To the extent the Court believes that a sentence under the advisory Sentencing Guidelines, however, is more appropriate, Mr. Weissman respectfully requests the Court sentence him pursuant to the provisions of U.S.S.G. § 5C1.1(c)(3) and (e), imposing a term of probation with a condition or combination of conditions requiring home detention as a substitution for imprisonment. *See* U.S.S.G. § 5C1.1, comment., n. 4. Such a sentence, accompanied by supervision, community service, and a monetary fine is sufficient but not greater than necessary to achieve the multi-faceted goals of federal sentencing. No matter what sentence the Court imposes, however, Mark Weissman will continue to be a major

contributor to his community and a substantial asset to all of those he comes in contact with, because this is the way Mr. Weissman has lived his entire adult life.

Dated:  November 14, 2019

Respectfully submitted,

By: _____/s/_____

Henry E. Mazurek
Evan L. Lipton
Meister Seelig & Fein LLP
125 Park Avenue, 7th Floor
New York, New York 10017
hem@msf-law.com
(212) 655-3500
*Counsel for Defendant Mark Weissman*